UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| GEORGE BAILEY, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 1:17-cv-00490-LEW |
| DAL GLOBAL SERVICES LLC, | ) | |
| Defendant | ) | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

George Bailey alleges his former employer, Defendant DAL Global Services, LLC, engaged in actions that violated provisions of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551-4634; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12217; and the Maine Family Medical Leave Requirements ("MFMLR"), 26 M.R.S.A. §§ 843-848.[1]  Compl. (ECF No. 1).  Defendant moves for summary judgment on all claims, asserting that "no genuine issues of material fact exist as to [Bailey's] allegations of discrimination and retaliation as a result of any real or perceived disability and/or use of protected leave."  Mot. Summ. J. (ECF No. 37).

For the reasons discussed herein, Defendant's motion is **GRANTED**.

---

[1] Plaintiff's complaint also included a claim for violation of the Federal Family Medical Leave Act, 29 U.S.C. § 2611; however, on February 18, 2019, Plaintiff voluntarily dismissed this claim.  Stip. of Dismissal (ECF No. 36).

**SUMMARY JUDGMENT FACTS**

The summary judgment facts are drawn from the parties' statements of material facts submitted in accordance with Local Rule 56. The Court will adopt a statement of fact if it is admitted by the opposing party and is material to the dispute. If a statement is denied or qualified by the opposing party, or if an evidentiary objection is raised concerning the record evidence cited in support of a statement, the Court will review those portions of the summary judgment record cited by the parties, and will accept, for summary judgment purposes, the factual assertion that is most favorable to the party opposing the entry of summary judgment, provided that the record material cited in support of the assertion is of evidentiary quality and is capable of supporting the party's assertion, either directly or through reasonable inference. D. Me. Loc. R. 56; *Boudreau v. Lussier*, 901 F.3d 65, 69 (1st Cir. 2018).

DAL Global Services ("DGS") hired Bailey in October 2012 and during the period relevant to this complaint, Bailey was employed as DGS's Station Manager at the Bangor International Airport. Def.'s Statement of Material Facts ("DSMF") ¶ 1 (ECF No. 38, #126). In this role, Bailey was responsible for overseeing all DGS activities within the Bangor International Airport and was expected to "be able to work various hours, nights, weekends, and holidays" in addition to being "[s]ubject to 'on call' responses." DSMF ¶¶ 9, 10. Bailey reports he was expected to be accessible to DGS employees at any time. DSMF ¶ 11.

From approximately 2014 until his resignation, Bailey reported directly to Roger Hundal, a DGS regional manager based in Atlanta.[2] DSMF ¶¶ 5, 7. During his tenure as Station Manager, Bailey had minimal in-person interaction with Mr. Hundal and instead communicated via telephone calls, emails, and/or text messages. DSMF ¶ 7. The record indicates there was conflict between Bailey and Hundal. Bailey reports that on one occasion, Hundal referred to Bailey's alleged hearing impairments[3] in a derogatory manner during a private phone conversation when he said: "I don't care if you are deaf, hear me now." DSMF ¶¶ 46, 52; Pl.'s Statement of Material Facts ("PSMF") ¶ 16 (ECF No. 40, #286). This was an isolated incident and no DGS employee ever commented on or spoke negatively about Bailey's alleged hearing loss again. DSMF ¶ 52.

In January or February 2015, Bailey filed a complaint with DGS Human Resources about Hundal's management style. DSMF ¶¶ 6, 7; PSMF ¶ 20. In this complaint, Bailey reported that Mr. Hundal frequently threatened to terminate him if he did not fulfill his responsibilities as Station Manager. DSMF ¶ 6. Bailey reports that Mr. Hundal's behavior was only temporarily affected by this HR complaint and that he reverted to making threats of termination after approximately two or three weeks.[4] PSMF ¶ 21.

---

[2] Prior to 2014, Sandie Samuelson served as DGS Regional Manager. DSMF ¶ 5.

[3] Although he did not submit documentation to substantiate his claims, Bailey asserts he has suffered from hearing loss throughout his life. PSMF ¶ 4. It is important to note, however, that Plaintiff admits that during his employment, he did not wear any form of a hearing aid, did not request an accommodation related to his alleged hearing loss, and experienced no negative impact on his ability to work as a station manager with DGS as a result of his hearing loss. DSMF ¶¶ 48, 50, 51.

[4] Despite being aware of DGS's confidential hotline employees could use to report concerns of discrimination or retaliation, Bailey admits he never called the hotline at any point during his employment with DGS. DSMF ¶¶ 58-59.

In early July 2015, a routine audit conducted by an airline serviced by DGS at Bangor International Airport revealed that DGS had failed to meet the airline's standards for safety and preparation for new service. DSMF ¶¶ 14, 15. Despite the failed audit, the record establishes Mr. Hundal and DGS did not initiate DGS's termination protocol against Bailey.[5] DSMF ¶¶ 16-17.

On July 16, 2015, Bailey was seen in the Emergency Room at St. Joseph's Hospital and was diagnosed with pneumonia. DSMF ¶ 18. Bailey promptly notified Mr. Hundal that he was being treated at St. Joseph Hospital, but, at that time, did not request any paid time off or leave pursuant to the Maine Family Medical Leave Requirements. DSMF ¶ 19. Bailey does not recall notifying Mr. Hundal regarding his specific diagnosis on this date. DSMF ¶ 20.

Once he contracted pneumonia, Bailey did not report to the Bangor International Airport. However, from July 16, 2015 until July 29, 2015, he continued to take work-related phone calls, responded to emails, and even reached out to a DGS supervisor to obtain a copy of the failed audit report. DSMF ¶¶ 21, 23. DGS paid Bailey throughout this period. DSMF ¶ 24.

On July 29, 2015, Bailey submitted documentation to DGS reflecting his pneumonia diagnosis along with a request for medical leave.[6] DSMF ¶ 25. This documentation

---

[5] As confirmed by Bailey, DGS's termination protocol required a manager such as Mr. Hundal to follow a specific process. DSMF ¶ 17. As part of this process, the employee being terminated would be asked to provide a statement addressing the reason for termination. *Id.* Under DGS standards, a manager could not independently terminate a direct report. *Id.*

[6] Bailey was only required to submit his medical record from the emergency room visit at St. Joseph's Hospital. DSMF ¶ 30. No other documents were required. *Id.*

indicated his condition was "temporary and not chronic in nature," started on July 16, 2015, and was expected to persist through August 16, 2015. DSMF ¶ 26. Following receipt of his request and supporting documentation, DGS retroactively granted medical leave under the Maine Family Medical Leave Requirements for two months, stretching from July 16, 2015 until September 16, 2015. DSMF ¶ 27; PSMF ¶ 13. Bailey did not experience any issues during the leave approval process. DSMF ¶ 29. Once he received notice of approval, Bailey turned off his work cell phone after notifying Mr. Hundal he would be doing so. DSMF ¶¶ 31-32. Between July 29, 2015 and September 8, 2015, Bailey did not communicate with anyone from DGS even though DGS employees continued to email Bailey and leave voicemails on Bailey's work cellphone. DSMF ¶¶ 33-35, 39. In his absence, DGS employees from the Portland station and the Bangor station filled in on Bailey's behalf. DSMF ¶ 36.

On September 8, 2015, while still on leave, Bailey emailed a letter of resignation to Mr. Hundal and a DGS Human Resources supervisor. DSMF ¶ 41. This letter indicated he was "prepared to work out his two-week notice" and reflected a termination date of September 22, 2015.[7] DSMF ¶ 41. Due to Bailey's security access at the Bangor

---

[7] In this letter, Bailey wrote:

> Dr. Mr. Hundal: I am writing to announce my resignation from DAL Global Services, effective two weeks from September 8, 2015. This was not an easy decision to make. The past three years have been very rewarding. I've enjoyed working for you and managing a very successful team. Thank you for the opportunities for growth that you have provided me. I wish you and DGS all the best. If I can be of any help during the transition, please don't hesitate to ask.

DSMF ¶ 42. Bailey later testified he "felt [he] had to give [his] resignation." Pl.'s Resp. Ex. 2 112:1 (ECF No. 40-2, #317). He believed "[i]t was blatantly obvious, or it felt blatantly obvious, to me that if I returned I would be terminated anyways." *Id.* 112:5-7. He also testified his pneumonia played a large

5

International Airport and DGS policies requiring an employee to complete a fitness for duty and drug screening prior to returning from medical leave, DGS declined to have Bailey return to work for the work week following the termination of Bailey's medical leave and prior to his proposed separation date. DSMF ¶ 44. Instead, DGS paid Bailey at his normal rate for this period. DSMF ¶ 44. On or around September 17, 2015, Bailey turned in his badge, work cell phone, and identification. DSMF ¶ 45.

Following his separation from DGS, Bailey filed for unemployment benefits. DSMF ¶ 56. On October 8, 2015, DGS sent Bailey a letter regarding his option to elect COBRA continuation coverage and this form indicated that his end of employment was "involuntary." PSMF ¶ 7. Similarly, a Maine Department of Labor document which had been filled out by a third-party, Equifax, and submitted on October 23, 2015, indicated that Bailey had been discharged from DGS. DSMF ¶ 57. The information upon which Equifax relied was supplied by DGS. PSMF ¶ 6. In April 2016, Bailey also filed a complaint with the Maine Human Rights Commission (which was dually filed with the EEOC and FEPA). PSMF ¶ 8. Bailey reports this complaint was "closed out . . . with a finding of no reasonable grounds" and the Maine Human Rights Commission issued a dismissal. Pl.'s Resp., 4 (ECF No. 39, #252).

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

role in his resignation: "I felt I had gotten my pneumonia from being run so ragged and pushed so hard at work and I didn't want to put myself into that position again." *Id.* 112: 14-17.

law." Fed. R. Civ. P. 56(a). As cautioned by the Supreme Court, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com*, *Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in his favor. *See Triangle Trading Co. v. Robroy Indus.*, *Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) ("Unless the party opposing a motion for summary judgment can identify a genuine issue as to a material fact, the motion may end the case.").

Plaintiff brings claims loosely alleging discrimination, retaliation, interference with protected leave, and failure to accommodate pursuant to the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551-4634; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213; and the Maine Family Medical Leave Requirements ("MFMLR"), 26 M.R.S.A. §§ 843-848. DGS challenges each of Bailey's claims while also raising the issue of whether Bailey has waived his ADA claim by failing to exhaust administrative remedies prior to filing this suit. I will consider each allegation in turn.

## I. AMERICANS WITH DISABILITIES ACT CLAIM

As a procedural matter, DGS asserts that Bailey waived his claim under the ADA by filing suit in this Court before he received a right-to-sue letter from the EEOC. Mot. Summ. J., 24-26. Bailey argues he received confirmation of the dual filing of his

7

administrative charge with the Maine Human Rights Commission and the EEOC, but that the EEOC failed to issue a right-to-sue letter when the Maine Human Rights Commission closed out his claim. Pl.'s Resp., 17. Then, to add more complexity to the equation, in its reply to Bailey's response, DGS asserts Bailey provided them with a copy of a right-to-sue letter from the EEOC on April 1, 2019. Def.'s Reply, 6 (ECF No. 41, #449). This letter, DGS alleges, is dated February 1, 2017. *Id.* DGS's argument then follows that Bailey failed to comply with the terms of the right-to-sue letter when he filed his lawsuit on December 19, 2017 – a date far outside the 90-day window stated in the right-to-sue letter. *Id.* at 6-7. It is important to note, however, that the summary judgment record is devoid of any evidence (beyond the parties' allegations) of a right-to-sue letter or record reflecting the dismissal of Bailey's claims by the Maine Human Rights Commission.

Claims brought under the ADA are subject to the procedural requirements outlined in Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9. *See* 42 U.S.C. § 12117(a) (applying Title VII procedural requirements to ADA claims). As explained by the First Circuit:

> One of these [procedural] requirements contemplates that, upon a claimant's exhaustion of administrative remedies, the EEOC will inform the claimant that she has 90 days within which to bring a civil action. [42 U.S.C.] § 2000e–5(f)(1). This notification is commonly termed a right-to-sue notice. *See id.* If the claimant does not bring suit within the prescribed 90–day period, the action is time-barred. *See id.; see also Chico–Vélez v. Roche Prods., Inc.*, 139 F.3d 56, 59 (1st Cir. 1998).

*Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 142 (1st Cir. 2012). The right-to-sue-letter requirement "is simply 'a precondition to bringing' suit, not a jurisdictional bar,

and thus 'can be waived by the parties or the court.'" *Martinez-Rivera v. Commonwealth of Puerto Rico*, 812 F.3d 69, 78 (1st Cir. 2016) (quoting *Pietras v. Bd. of Fire Comm'rs of Farmingville Fire Dist.*, 180 F.3d 468, 474 (2d Cir.1999)).

DGS has not waived the right-to-sue letter requirement but because the summary judgment record is unclear regarding whether Bailey was issued a right-to-sue letter, summary judgment on this point is inappropriate.

## II. ADVERSE EMPLOYMENT ACTION

Bailey alleges discrimination and retaliation under the Americans with Disabilities Act ("ADA"), the Maine Human Rights Act (MHRA), and the Maine Family Medical Leave Requirements ("MFMLR"). The gravamen of Bailey's substantive arguments is that he was repeatedly demeaned, treated unfairly, and discriminated against by his employer – the net effect of which ultimately required him to involuntarily resign.

While the prima facie elements of each claim vary slightly, one common thread runs throughout: to successfully allege discrimination under the MHRA or the ADA, or retaliation under the MHRA, the ADA, or the MFMLR, the plaintiff must have experienced some form of adverse employment action causally connected with either his disability or his protected action.[8] If a plaintiff is able to establish a prima facie case of discrimination

---

[8] To establish a prima facie case of disability discrimination under the MHRA, Bailey must establish: (1) he "suffers from a disability"; (2) he is "otherwise qualified, with or without reasonable accommodations, and is able to perform the essential functions of the job"; and (3) he was "*adversely treated by the employer based in whole or in part on [his] disability.*" *Doyle v. Dep't Of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48. Bailey must prove the same elements to prevail on a disability discrimination claim under the ADA. *See, e.g., Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011). Similarly, to make out a prima facie case of retaliation under the MFMLR, Bailey must establish "(1) he availed himself of a protected right under the [MFMLR]; (2) *he was adversely affected by an employment*

or retaliation, an employer is provided the opportunity to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 134 (1st Cir. 2017) (quoting *Collazo-Rosado v. Univ. of Puerto Rico*, 765 F.3d 86, 92 (1st Cir. 2014)). If a nondiscriminatory reason is established, then the burden returns to the plaintiff to demonstrate the purported reason is a pretext for discrimination or retaliation.[9] *Id.*

Although "[a]n adverse employment action need not rise to the level of discharge to be actionable," at minimum, it must "impair or potentially impair the plaintiff's employment in some cognizable manner." *Nelson v. Univ. of Maine Sys.*, 923 F. Supp. 275, 281 (D. Me. 1996). Examples of actionable adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." *Hernandez–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998). Here, Bailey

---

*decision*; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 161 (1st Cir. 1998) (emphasis added); *see also Cote v. T-Mobile USA, Inc.,* 168 F. Supp. 3d 313, 331 (D. Me. 2016) (indicating "the same analysis governs both . . . FMLA and . . . MFMLA" retaliation claims). Likewise, to successfully allege a claim of retaliation under the MHRA, Bailey must meet the criteria for an ADA claim: "(1) that he engaged in protected conduct, (2) *that he suffered an adverse employment action*, and (3) that there was a causal connection between the protected conduct and the adverse employment action." *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 35 (1st Cir. 2010); *see also Soileau v. Guilford of Maine, Inc*., 928 F. Supp. 37, 45 (D. Me. 1996), *aff'd*, 105 F.3d 12 (1st Cir. 1997) ("In analyzing the ADA and MHRA, the Court need not continuously distinguish between the two statutes as to their scope and general intent because Maine courts consistently look to federal law in interpreting state anti-discriminatory statutes.").

[9] Under Maine law, a plaintiff can overcome a motion for summary judgment by presenting evidence to support every element of the prima facie case. The burden-shifting approach is not utilized. *Sullivan v. St. Joseph's Rehab. and Residence*, 143 A.3d 1283, 1289 & N.5 (Me. 2016).

alleges he suffered two inherently contradictory adverse employment actions: first, that he was terminated and second, that he was constructively discharged.

### A. Termination

To substantiate his claim of termination, Bailey points to two factual allegations. First, he contends that DGS's decision to decline having him return to work for the week following his sick leave (and prior to his self-selected resignation date) essentially amounted to involuntary termination. Pl.'s Resp., 6. Second, he argues that because he received paperwork from both DGS and a third-party vendor following his separation indicating his termination was "involuntary," he has raised a genuine issue of material fact regarding whether he was terminated. *Id.*

Contrary to these assertions, the record is clear: Bailey – in the absence of termination proceedings by DGL – resigned from his position as Station Manager when he submitted his notice of resignation. *See, e.g., Torrech-Hernandez v. Gen. Elec. Co.*, 519 F.3d 41, 50 (1st Cir. 2008) (likewise holding that a plaintiff resigned when he "initiated the talks that lead to his resignation," "expressed a desire to leave," and, "most tellingly," tendered an "unambiguously worded resignation announcement[] without being prompted or instructed to do so by [his employer]."). In his resignation letter, Bailey wrote:

> Dr. Mr. Hundal: I am writing to announce my resignation from DAL Global Services, effective two weeks from September 8, 2015. This was not an easy decision to make. The past three years have been very rewarding. I've enjoyed working for you and managing a very successful team. Thank you for the opportunities for growth that you have provided me. I wish you and DGS all the best. If I can be of any help during the transition, please don't hesitate to ask.

DSMF ¶ 42. As the First Circuit concluded in *Torretech-Hernandez,* Bailey's "words speak for themselves." 519 F.3d at 50.

DGS's actions following receipt of this notice of resignation also fall far short of substantiating Bailey's claims of termination. Bailey has failed to point to any case law supporting his argument that DGS's decision to forgo his final week of work but continue to pay him at his regular rate amounts to termination and I am unaware of any support for such a theory. In any event, even if this action could potentially establish a presumption of discrimination or retaliation, Bailey acknowledges and accepts DGS's proffered (and non-retaliatory or discriminatory) explanation for declining to have him to return to work: DGS desired to avoid the procedural hurdles and costs associated with Bailey's security clearances and DGS policies requiring a fitness for duty exam and drug screening for each employee returning from medical leave. DSMF ¶ 44. Likewise, documentation provided after his voluntary resignation and separation from the company reflecting that he was terminated does not, in itself, retroactively transform his resignation into a termination.

**B. Constructive Discharge**

In stark contrast to his allegations of termination, Bailey admits he submitted a resignation letter to DGS, but asserts his resignation was given involuntarily – in short, that he was constructively discharged. On this point, Bailey argues Mr. Hundal "engaged in a pattern of behavior against Mr. Bailey that included yelling and threatening Mr. Bailey with termination on a routine basis," made a single disparaging comment to Bailey regarding his hearing, and required Bailey to be available to DGS employees around the clock "no matter what hour or how trivial the matter was." Pl.'s Resp., 6-7. Ultimately,

Bailey argues these interactions amounted to a hostile work environment which necessitated his resignation. *Id.*

To prevail on a constructive discharge claim premised on the creation of a hostile work environment,[10] Bailey must show his working conditions were "so intolerable" that his "seemingly voluntary resignation" was, in reality, a termination that was "void of choice or free will." *Torrech-Hernandez*, 519 F.3d at 50; *Sullivan v. St. Joseph's Rehab. & Residence*, 2016 ME 107, ¶ 21, 143 A.3d 1283. To qualify, the interactions forming the basis of Bailey's complaint must, when looking to the totality of the circumstances, be sufficiently severe or pervasive, as measured by the "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), that a reasonable person would feel "compelled to resign," *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 45 (1st Cir. 2003). While an isolated incident of harassment or a one-off comment may, in rare cases, be actionable, to qualify it must be severe to the point it "cause[s] the workplace to become hostile or abusive." *Doyle v. Dep't Of Human Servs.*, 2003 ME 61, ¶ 23, 824 A.2d 48; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)

---

[10] In full, to successfully allege a hostile work environment claim, Bailey would have to show:

> (1) [H]e is a member of a protected class; (2) []he was subject to harassment; (3) the harassment was based on [his] membership in a protected class; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of [his] employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) there exists some basis for employer liability.

*Flood v. Bank of Am. Corp.*, 780 F.3d 1, 10 (1st Cir. 2015).

("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal citations and quotation marks omitted)). This is a very high standard. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."); *see also Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 28 (1st Cir. 2002) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992))). As the First Circuit noted: "The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins – thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000).

Even when viewing the record in the light most favorable to Bailey, Bailey's allegations fall short of establishing a sufficiently severe or pervasive hostile work environment to support his claim of constructive discharge.

Mr. Hundal's comment ("I don't care if you are deaf, hear me now") made once over the phone may have been offensive, but it can hardly be severe enough to create a sufficiently caustic work environment or "amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788. As stated by the First Circuit: "Offhand comments and a tense or uncomfortable working relationship with one's supervisor are,

without more, insufficient to support a hostile work environment claim." *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 12 (1st Cir. 2015); *see also Frank v. L.L. Bean, Inc.*, No. CIV. 04-221-P-S, 2006 WL 47557, at *14 (D. Me. Jan. 9, 2006), *report and recommendation adopted*, No. CIV. 04-221-P-S, 2006 WL 462339 (D. Me. Feb. 23, 2006) (reaffirming that to be actionable, an employer's statement must "r[i]se to the level of abusive or humiliating treatment as opposed to a mere 'offensive utterance'").

Likewise, Bailey's argument that his schedule – which the record reveals was an established requirement of his employment as Station Manager – somehow forms the basis of a hostile workplace claim is unsuccessful. DSMF ¶ 10; Pl.'s Resp. Ex. 3 (ECF No. 40-3, #360) ("Work Schedule: Must be able to work various hours, nights, weekends, and holidays. Some overtime may be required. Subject to 'on call' responses."). While a change in schedule (or a refusal to change schedules upon reasonable request) may, in some cases, be indicative of retaliation or discrimination, *see, e.g., Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 69 (2006), the requirement that Bailey be subject to on call responses was a core function of his role and remained constant throughout his employment as Station Manager.

Along a similar vein, the uncontested facts establish that although Mr. Hundal threatened Bailey with termination on various occasions, these threats (whether justified or not) were not tethered to or because of any disability or protected action. Instead, Bailey's own testimony establishes that Mr. Hundal's threats – which consisted of statements such as "[y]our job depends on you doing this" or "or else" statements Bailey took to mean a

threat of termination – predated Bailey's use of protected leave or pneumonia diagnosis [11] and pertained not to his alleged hearing deficit, but rather to his performance (or lack thereof) of his duties as Station Manager. Pl.'s Resp., Ex. 2 100:19-23 (ECF No. 40-2, #317); *see also Pierre v. Napolitano*, 958 F. Supp. 2d 461, 476 (S.D.N.Y. 2013) ("[A] threat of termination, without more, is not an adverse employment action."). Although, as Bailey testifies, these threats made him feel as though he had to give his resignation because "[i]t was blatanly obvious, or it felt blatantly obvious, to [him] that if [he] returned [he] would be terminated anyways," Pl.'s Resp. Ex. 2, 112:1-7, his subjective worries are insufficient, *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir. 1986) ("[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985))). As held by the First Circuit, "apprehension of future termination is insufficient to establish constructive discharge – instead, an employee is obliged not to assume the worst, and not to jump to conclusions too fast." *Torrech-Hernandez*, 519 F.3d at 52 (citations and quotation marks omitted). Like the plaintiff in *Torrech-Hernandez*, Bailey's resignation "was grossly premature, as it was based entirely on his own worst-case-scenario assumption as to his future" at DGS. *Id.*

I conclude Bailey's hostile work environment claim is "so marginal that it can be decided by the Court on summary judgment." *Charette v. St. John Valley Soil & Water*

---

[11] Ironically, the record reveals Bailey's pneumonia diagnosis motivated him to resign. He stated: "I felt I had gotten my pneumonia from being run so ragged and pushed so hard at work and I didn't want to put myself into that position again. . . . I felt I had to get done. I had to give my notice." Pl.'s Resp., Ex. 2 112:14-22.

16

*Conservation Dist.*, 332 F. Supp. 3d 316, 353 (D. Me. 2018). By extension, Bailey likewise fails to allege facts to establish he was constructively discharged.

## C. Summary

Because Bailey has failed to raise a genuine issue for trial to support his contention that he suffered an adverse employment action, and because he resigned, he fails to establish a prima facie case of discrimination or retaliation and DGS is entitled to summary judgment on these claims.

## III. INTERFERENCE WITH MAINE FAMILY MEDICAL LEAVE

Under the MFMLR, "[e]very employee . . . is entitled to up to 10 work weeks of family medical leave in any 2 years." 26 M.R.S. § 844(1). To ensure this guarantee, the MFMLR prohibits an employer from "interfer[ing] with, restrain[ing] or deny[ing]" an employee's appropriate attempt to exercise the rights provided by the MFMLR. 26 M.R.S. § 847. At its core, a MFMLR interference claim confronts an employer's restraint on or denial of an employee's "right to an entitlement"; therefore, if Bailey establishes, *inter alia*, that DGS denied him leave due under the statute, he will have substantiated the interference claim. [12] *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998). Unlike retaliation or discrimination claims, an employer's intent is irrelevant to an interference claim. *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 722 (1st Cir.

---

[12] In full, to allege an FMLA interference claim – and therefore, a MFMLR interference claim – Bailey would be required to establish (1) that he qualified as an 'eligible employee,' (2) that DGS was an employer covered by the Act, (3) that he qualified for FMLA benefits, (4) that he provided notice to DGS, and (5) that DGS denied him the benefits to which he was entitled under MFMLR. *Morin v. Hannaford Bros. Co.*, LLC, No. 1:17-CV-50-GZS, 2018 WL 2746570, at *16 (D. Me. June 7, 2018) (quoting *Wheeler v. Pioneer Developmental Servs., Inc.*, 349 F. Supp. 2d 158, 164 (D. Mass. 2004)).

2014). The issue is "simply whether the employer provided its employee the benefits to which [he] was entitled." *Id.*

In Count I, Bailey does not assert that DGS wrongly denied his request for MFMLR leave; instead, his argument centers on his ongoing communications with DGS during the nearly two-week period from July 16th until July 29th – a period for which he was retroactively granted medical leave, but during which time he took work-related phone calls, responded to emails, and even reached out to a DGS supervisor to obtain a copy of an audit report. Pl.'s Resp., 9. Bailey asserts he was "essentially require[ed] . . . to work during his medical leave" and "harassed" by DGS during his leave. Compl. ¶ 46.

As Plaintiff argues, "[t]he ability to take FMLA leave is not conditioned upon the willingness of an employee to remain 'on call' to the employer." *Sherman v. AI/FOCS, Inc.*, 113 F. Supp. 2d 65, 70 (D. Mass. 2000). However, it was not DGS's duty to proactively determine whether Bailey's initial leave should be covered by the MFMLR. The responsibility was upon Bailey to provide notice and, if requested, certification to verify the amount of leave requested. 26 M.R.S. § 844(1)(A), (B); *see also Morin v. Hannaford Bros. Co., LLC,* No. 1:17-CV-50-GZS, 2018 WL 2746570, at *16 (D. Me. June 7, 2018) ("To prevail on an FMLA interference claim, the employee . . . 'has to prove that []he gave h[is] employer appropriate notice.'" (quoting *Wheeler v. Pioneer Developmental Servs., Inc.*, 349 F. Supp. 2d 158, 164 (D. Mass. 2004))); *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998) ("[N]othing in the statute places a duty on an employer to affirmatively grant leave without such a request or notice by the employee."). Thus, during the period from July 15th until July 29th, DGS did not interfere with Bailey's protected leave

as Bailey had not yet requested MFMLR leave and DGS was under no affirmative duty to identify his absence as protected leave. Once Bailey submitted his request for leave along with medical documentation, DGS immediately granted Bailey two months' leave. The record also establishes that when Bailey was on protected leave, he had no contact with DGS because, with Mr. Hundal's approval, he turned off his phone and did not access his email account until submitting his resignation. The fact that unidentified coworkers continued to email him or leave voicemail messages is irrelevant as it is clear Mr. Hundal did not expect Bailey to remain "on call" or continue to work while on leave. *Persson v. Bos. Univ.*, No. CV 15-14037-JGD, 2019 WL 917205, at *18 (D. Mass. Feb. 25, 2019) (finding no interference with leave when the plaintiff was not required to work throughout her leave and was not "on call" during her leave, even though she received two calls from work). Because Bailey fails to raise a genuine issue of material fact pertaining to his claim that DGS interfered with his rights under the MFMLR, DGS is entitled to summary judgment on this claim.

## IV. FAILURE TO ACCOMMODATE

In a failure to accommodate claim, the plaintiff "bears the initial burden of making a sufficiently direct and specific request for accommodation, unless the employer otherwise knew that one was necessary." *Morissette v. Cote Corp.*, 190 F. Supp. 3d 193, 210 (D. Me. 2016); *see also Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007) (explaining that a plaintiff's request "must be sufficiently direct and specific," and "must explain how the accommodation requested is linked to some disability" (quotation marks and citations omitted)). To qualify as "sufficiently direct and specific," an employee's

request must "provide sufficient information to put the employer on notice of the need for accommodation" and "explain how the accommodation is linked to [the] plaintiff's disability." *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012).

Bailey asserts DGS violated both the ADA and the MHRA by "refus[ing] to give [him] a reasonable accommodation." Compl. ¶¶ 57, 70. However, by his own admission, Bailey's only accommodation request was his request for time off due to his bout of pneumonia (which he asserts qualifies as a "disability" for purposes of the ADA and the MHRA) – a request which DGS granted without delay. DSMF ¶¶ 12, 27. Bailey made no other accommodation requests relating to his hearing loss or any other alleged disability. *See* DSMF ¶¶ 12, 37, 50. Because Bailey fails to point to any "direct and specific request for accommodation" that was denied by DGS and also fails to even argue that DGS "otherwise knew that [an accommodation] was necessary" on account of any alleged 'disability' other than his pneumonia, *Morissette*, 190 F. Supp. 3d at 210, DGS is entitled to summary judgment on Bailey's failure to accommodate claims.

## CONCLUSION

For the reasons discussed above, the motion for summary judgment filed by DAL Global Services, LLC (ECF No. 37) is **GRANTED**.

**SO ORDERED.**

Dated this 29th day of July, 2019

                                                       /s/ Lance E. Walker
                                                     U.S. DISTRICT JUDGE